Gene C. Schaerr
James C. Phillips
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, D.C. 20006
Telephone: (202) 787-1060
Facsimile: (202) 776-0136
gschaerr@schaerr-jaffe.com
jphillips@schaerr-jaffe.com

*Counsel for Amici Curiae*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| IN RE: THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS TITHING LITIGATION<br><br>*This document relates to all actions.* | **BRIEF OF THE GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS AND NATIONAL ASSOCIATION OF EVANGELICALS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS**<br><br>Case No. 2:24-md-03102-RJS-DAO<br><br>Chief Judge Robert J. Shelby<br><br>Mag. Judge Daphne A. Oberg |

## CORPORATE DISCLOSURE STATEMENT

As required by Federal Rule of Civil Procedure 7.1(a) and Utah Local Civil Rule 7-6(d)(1)(A), *Amici* certify that they do not have a parent corporation and that no publicly held corporation owns more than ten percent of their stock.

Dated: September 24, 2024

/s/ *Gene C. Schaerr*
Gene C. Schaerr

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION, SUMMARY, AND INTEREST OF *AMICI* ................................... 1

ARGUMENT .............................................................................................................. 3

    I.    Plaintiffs' Lawsuit Threatens All Religious Bodies. .................................... 3

    II.   The Church Autonomy Doctrine's Fraud Exception is Moribund, But Even If It Still Exists, the Two Narrow Situations that Trigger It Are Absent Here. ......................................................................................... 5

        A.    Overt self-dealing fraud ................................................................. 7

        B.    Quasi-contract fraud ...................................................................... 9

    III.  "Neutral Principles" is Not a Global Exception to Church Autonomy and Does Not Apply Outside of the Singular Question of Property Division Consequential to a Church's Schism. ......................................... 11

CONCLUSION .......................................................................................................... 14

APPENDIX ................................................................................................................. 15

CERTIFICATE OF COMPLIANCE .......................................................................... 16

# TABLE OF AUTHORITIES

**Cases**   **Page(s)**

*Colo. Christian Univ. v. Weaver*,
    534 F.3d 1245 (10th Cir. 2008) .................................................................................. 9

*Erdman v. Chapel Hill Presbyterian Church*,
    286 P.3d 357 (Wash. 2012) ...................................................................................... 13

*Espinosa v. Rusk*,
    634 F.2d 477 (10th Cir. 1980) .................................................................................... 8

*Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*,
    451 F. Supp. 3d 1227 (D. Utah 2020) ...................................................................... 13

*Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*,
    551 F. Supp. 3d 1206 (D. Utah 2021) ...................................................................... 13

*Gonzalez v. Roman Cath. Archbishop of Manila*,
    280 U.S. 1 (1929) ........................................................................................................ 5

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
    565 U.S. 171 (2012) .......................................................................................... 4, 6, 12

*Hutchison v. Thomas*,
    789 F.2d 392 (6th Cir. 1986) .................................................................................... 12

*Jones v. Wolf*,
    443 U.S. 595 (1979) ............................................................................... 6, 11, 12, 13

*Kedroff v. Saint Nicholas Cathedral of Russ. Orthodox Church
    in N. Am.*, 344 U.S. 94 (1952) ............................................................................... 4, 6

*Md. & Va. Eldership of Churches of God v. Church of God
    at Sharpsburg, Inc.*, 396 US 367 (1970) ................................................................ 11

*Mitchell v. Helms*,
    530 U.S. 793 (2000) .................................................................................................... 8

*Our Lady of Guadalupe School v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020) ......................................................................................... 6, 12

*Presbyterian Church v Hull Mem'l Church,*
  393 U.S. 440 (1969) ................................................................................... 11

*Schmidt v. Catholic Diocese of Biloxi,*
  18 So.3d 814 (Miss. 2009) ............................................................. 9, 10, 11

*Serbian E. Orthodox Diocese v. Milivojevich,*
  426 U.S. 696 (1976) ............................................................................. 6, 12

*Tilton v. Marshall,*
  925 S.W.2d 672 (Tex. 1996) .................................................................. 7, 8

*U.S. v. Ballard,*
  322 U.S. 78 (1944) .................................................................................. 14

*Watson v. Jones,*
  80 U.S. (13 Wall.) 679 (1871) ................................................................... 5

## Other Authorities

*Abundant Rain During Drought,* Archive:Islam ........................................... 4

*Deuteronomy* ................................................................................................ 1

Carl H. Esbeck,
  *An Extended Essay on Church Autonomy,*
  22 Federalist Soc'y Rev. 244 (2021) ....................................................... 13

*Genesis* ......................................................................................................... 1

*Malachi* (King James) ................................................................................... 1

*Numbers* ....................................................................................................... 1

## INTRODUCTION, SUMMARY, AND INTEREST OF *AMICI*[1]

This case is largely about the meaning of a religious term: tithing. The Judeo-Christian practice of paying tithes is at least four millennia old. *See Genesis* 14:20; *Numbers* 18:21–28; *Deuteronomy* 14:23, 28. Today, millions of Jews and Christians alike heed the words in Scripture to "[b]ring ye all the tithes into the storehouse." *Malachi* 3:10 (King James translation).

Despite being long and widely practiced, there is no religious consensus on the definition of tithing. Is it required or recommended? Is it 10% of one's income or any received amount? Is it calculated on gross or net income, or some other measure? Is it still called a tithe after receipt by the religious organization? And if so, does a tithe refer only to the original donation, or does it include interest or other return that has accrued on the donation? Across faiths and within faiths, there are multiple responses to these questions. Yet Plaintiffs insist that a civil judge or jury possess final theological prowess to answer these questions, which is the religious dispute at the heart of this case. To allow courts to decide a church's internal quarrels will run through the First Amendment's guardrail—a mishap Plaintiffs' suit cannot survive.

This suit runs afoul of the First Amendment in at least three ways: First, it requires that a civil judge decide an intra-church dispute over the meaning of the

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity, other than *amici* and its counsel, made any monetary contribution intended to fund its preparation or submission. The parties have filed a blanket consent to the filing of *amicus* briefs in this case.

religious practice of tithing and other religious donations, such as "Fast Offerings." Second, it seeks to authorize a civil judge to determine which of differing religious understandings of tithing that leaders of The Church of Jesus Christ of Latter-day Saints ("Church")—a hierarchical church—were invoked when they made statements challenged by Plaintiffs, and then to go on and have a jury determine whether Plaintiffs reasonably relied on those statements. Third, it interjects civil courts into the internal governance of the Church—with employees of the government second-guessing Church leaders' religious judgments about *how* and *when* to use the funds donated to it. In each of these respects, such a decision offends the First Amendment's church autonomy doctrine.

Nor can Plaintiffs skirt around these First Amendment barriers by relying on fraud as an exception to church autonomy doctrine, or by invoking the "neutral principles of law" approach. It's not clear that the fraud exception still exists. But even if it does, the narrow contexts where courts have applied it—overt-self dealing and quasi-contracts—do not apply here. Further, the neutral-principles approach only applies in the context of property disputes downstream from a church schism, and only if it does not involve an inquiry into religious doctrine or deciding a religious controversy. That's not even close to the context here, and that's exactly the forbidden First Amendment ground Plaintiffs ask this Court to tread.

*Amici* (each described in the Appendix) collectively represent millions of Americans of faith, and they are deeply troubled by the constitutional violation this

2

lawsuit would represent if allowed. That is not because *amici* are in theological agreement with the Church about the practice of tithing. Their concern, rather, is that if Plaintiffs' lawsuit is successful, no religious organization will be safe from judicial or jury intrusion into matters of internal governance, as this multi-district litigation involving suits from around the country shows. *Amici* therefore urge the Court to dismiss this massive entanglement between church and state.

## ARGUMENT

### I.    Plaintiffs' Lawsuit Threatens All Religious Bodies.

*Amici* support the pending motions to dismiss (ECF Nos. 79 & 80) because there is nothing about Plaintiffs' Complaint over the meaning and use of "tithing" that would cabin their logic to a definable set of cases involving the Church, or even just Christian organizations, or even just tithing. If a court can put on blinders by characterizing as purely "secular" an inquiry into the meaning of a religious term or the religious rationale behind the use of tithing funds, as indicated and decided by a church's highest ecclesiastical leaders, then there is no autonomous ground left under the First Amendment for religious organizations.

Under Plaintiffs' logic, every religious dispute can be reframed as "secular," thereby circumventing constitutional protections for religious entities and societies. For example, Catholic teaching that the bread and wine consumed during Mass have been transformed into the body and blood of Christ could be considered a secular question, with the Catholic Church liable for that transformation as determined by

material scientists. Or religious claims by Muslims about events in the life of Mohammed, such as causing it to rain during a drought in Medina,[2] could be investigated by historians and geological hydrologists, and liability imposed depending on their findings.

This transforming the sacred into the secular by *ipse dixit* in Plaintiffs' pleading has no limiting principle. It is cabined only by a plaintiff's invitation to judicial imagination. The logic of Plaintiffs' suit, if countenanced by this Court, will create a threat to religious groups that matters of doctrine or internal governance will be probed by civic factfinders, as channeled by rules of evidence, with liability to follow from their supposedly "secular" findings. *Compare Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188 (2012) (holding that "action interfere[ing] with the internal governance of the church" violates the First Amendment); *id.* at 186 (observing that the First Amendment "radiates . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine") (quoting *Kedroff v. Saint Nicholas Cathedral of Russ. Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)).

---

[2] *Abundant Rain During Drought,* Archive:Islam, https://archiveislam.com/aubndant-rain-during-drought.html (last visited Sept. 23, 2024).

That broad threat is not the only one: Any time a religious organization, via one of its leaders or an official publication, says something about the religious status and use of donated funds that can be contradicted by an allegation from a disgruntled former employee or member, a jury or judge, under Plaintiffs' reasoning, will now have to decide which party has the better theological understanding. This means members may spring up everywhere to sue over a comment made at some time about some use of funds that a now disgruntled member donated *generally* to his or her religious organization. This multi-district litigation suit is tangible evidence that *amici* do not exaggerate. And, if Plaintiffs have their way, instead of being dismissed out of the gate under the church autonomy doctrine, courts or juries will ultimately decide these religious disputes. While such an innovative cause of action may be an attractive outcome for the plaintiffs' trial bar, it will breed constitutional chaos for religious organizations and hopelessly entangle courts in religious affairs.

## II. The Church Autonomy Doctrine's Fraud Exception is Moribund, But Even If It Still Exists, the Two Narrow Situations that Trigger It Are Absent Here.

In an effort to skate around the First Amendment, Plaintiffs rely upon various supposed "exceptions" to the church autonomy doctrine. Those are grounded in Supreme Court dicta, which at one time recognized three exceptions to the so-called "Watson rule" of church autonomy: "fraud, collusion, or arbitrariness." *See Gonzalez v. Roman Cath. Archbishop of Manila,* 280 U.S. 1, 16 (1929) (citing *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 727, 733 (1871)); *see also Serbian E. Orthodox Diocese v.*

*Milivojevich,* 426 U.S. 696, 712 (1976) (labeling *Gonzalez*'s "exception to the Watson rule" as "dictum only").

However, after noting that the Court had previously (in *Kedroff v. St. Nicholas Cathedral*) elevated the church autonomy doctrine to constitutional status, the *Serbian E. Orthodox* Court observed that "no decision of this Court has given concrete content to or applied" these exceptions. 426 U.S. at 712-13. And so the Court rejected the exception relevant in that case—arbitrariness—as prohibited by the First Amendment, also noting that fraud and collusion had no relevance in that case. *See id.* at 713. Since then, the Court has never held that there is a fraud or collusion exception to the First Amendment's church autonomy doctrine. *See Jones v. Wolf*, 443 U.S. 595, 609 n.8 (1979) (noting that "[t]here is no suggestion in this case . . . of 'fraud' or 'collusion,'" so "[i]n the absence of such circumstances" the church autonomy doctrine "'mandate[d] that civil courts shall not disturb the decisions'" of church officials). In short, a supposed fraud exception to church autonomy has not been mentioned by the Supreme Court in almost half a century, and the Court has never clearly held that such a claim ever existed consistent with the First Amendment.[3]

Moreover, even if this Court determines that a fraud exception to the church autonomy doctrine exists, as in the two circumstances recognized by a few state

---

[3] In the Court's most recent church autonomy cases—*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012)*; Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020)—there is nothing about fraud as a possible exception to church autonomy.

6

courts—overt self-dealing or quasi-contract—those circumstances are not present here.

### A.      *Overt self-dealing fraud*

The Texas Supreme Court has laid out a framework for overt self-dealing fraud claims in the church autonomy context in *Tilton v. Marshall*, 925 S.W.2d 672 (Tex. 1996). Plaintiffs sued a televangelist and his church for fraud, among other claims, after donating thousands of dollars accompanied by prayer requests. *Id*. at 675. The plaintiffs alleged that the pastor had fraudulently claimed that he would "personally and actually read, touch and pray over each of these requests," if they would send him money, and that by his representation, "the one making the vow . . . will receive whatever is requested." *Id*. at 676.

The Texas Supreme Court determined that the plaintiffs' "fraud claims fall into two categories": (1) that the televangelist "would perform certain concrete acts"; and (2) "allegedly fraudulent and deceitful representations of religious doctrine or belief." *Id*. at 679. The court found no First Amendment danger in allowing the first type of fraud claim to go forward because, "[a]lthough the trier of fact must determine whether [the televangelist] made these promises and failed to perform them, plaintiffs may satisfy the falsity element of a fraud claim by proving that [the televangelist] had no intention of personally reading, touching, and praying over their prayer requests at the time he said he would do so." *Id*.

The court found that the second category of claims crossed the constitutional line because, "[w]hether or not made sincerely, such representations are statements of religious doctrine or belief." *Id.* And so "the trier of fact" is forbidden from "hear[ing] evidence regarding them or pass[ing] on their veracity" under the First Amendment. *Id.* at 680.

Applying that framework here, Plaintiffs' fraud claim cannot pass constitutional scrutiny. That's because, in the context of tithing payments by a donor to the Church, one cannot separate out "concrete acts" from "representations of religious doctrine or belief." *Id.* at 679. For example, Plaintiffs may argue that the promise by ecclesiastical leaders that no tithing funds would be spent on the City Creek Mall project is the "concrete act" that a trier of fact can investigate. However, to factually probe into that act requires an investigation of the meaning of tithing. And that would mean the court choosing between Plaintiffs' apparent definition— they never actually provide a clear one—or the definition used by church leaders. Moreover, "[i]t is well established[] … that courts should refrain from trolling through a person's or institution's religious beliefs." *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion). *See also Espinosa v. Rusk*, 634 F.2d 477, 480 (10th Cir. 1980) (charitable solicitation regulation requiring civil authorities to first distinguish between "spiritual" or temporal motive of donors, and require reporting of only the latter, violated church autonomy), *summarily aff'd,* 456 U.S. 951 (1982) (mem.) (granting appeal and affirming without opinion); *Colo. Christian Univ. v. Weaver*, 534

F.3d 1245, 1264-65 (10th Cir. 2008) (requiring state actors "to wade into issues of religious contention" to determine if college was "pervasively sectarian" would violate the First Amendment).

In short, the First Amendment forbids applying this version of the fraud exception (assuming it still exists) to the church autonomy immunity raised here.

### B.   *Quasi-contract fraud*

The other fraud exception to church autonomy doctrine that a few state courts have recognized is based in quasi-contract—as for example, *Schmidt v. Catholic Diocese of Biloxi*, 18 So.3d 814 (Miss. 2009). Over 150 former parishioners of the St. Paul Catholic Church sued the Catholic Diocese, its bishop, and the cleric who was the priest at the church. *Id.* at 818. The plaintiffs did so because they had made donations for the reconstruction of the church after it was damaged in a hurricane, arguing that the priest had made "misrepresentations in soliciting donations for the rebuilding efforts" because "plans were initiated to rebuild the St. Paul Church, and donations were solicited and given for that purpose." *Id.* at 818, 819. A year and a half later, the bishop scrapped the plans to rebuild the St. Paul Church "because of a shortage of priests" and because the church was located in a flood zone. *Id.* at 819. Plaintiffs argued, among other things, that the priest "solicited donations for the rebuilding of the church, while having knowledge that the church would not be reopened," and thus engaged in intentional misrepresentation. *Id.* at 823.

9

Regarding this misrepresentation claim, the court observed that "the First Amendment does not protect fraudulent statements *that concern neither religious doctrine nor practice*." *Id*. at 831 (emphasis added) (citation omitted). And so the court allowed the intentional misrepresentation claim to go forward. *Id*. at 831-32.

*Schmidt* and cases like it differ significantly from the situation here. In *Schmidt*, the circumstances were such that the court merely asked whether there was an expressed condition on the donation and asked whether it was later waived by the donor. This requires a bare question of fact, not a mixed question of donor "reasonable expectations" and the meaning of "tithe" in the Church's practice.

The case here is quite different. There is no claim that the leaders of the Church were soliciting tithing for a specific purpose. In fact, what the Church allegedly claimed it would or would not use the tithing funds for was irrelevant to the religious mandate to pay tithing resting on all church members. Further, tithing is paid by church members with no strings attached. Plaintiffs do not allege they imposed any conditions on their tithing or other donations. Plaintiffs, then, were not lured into making a donation based on representations—any representations were irrelevant to Plaintiffs' unconditional, general religious duty to tithe. Likewise, the alleged fraudulent statements here "concern [questions of]. . . religious doctrine [and] practice," making an inquiry into fraud violative of the First Amendment. *Id*. at 831 (citation omitted).

10

Thus, a quasi-contract fraud exception to church autonomy doctrine—even if it exists—does not apply here.

### III. "Neutral Principles" is Not a Global Exception to Church Autonomy and Does Not Apply Outside of the Singular Question of Property Division Consequential to a Church's Schism.

Besides the possibility of limited fraud exceptions to church autonomy, the Supreme Court has recognized a narrow context in which "neutral principles" of law may be applied to a dispute between religious entities, but only in lawsuits over church property by two factions which have divided the church. *See Presbyterian Church v Hull Mem'l Church*, 393 U.S. 440 (1969); *Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 US 367 (1970) (per curiam). It would be error to expand the "neutral principles" framework beyond property questions arising from a church schism.

The Supreme Court's most recent iteration of this principle, *Jones v. Wolf*, "involve[d] a dispute over the ownership of church property following a schism in a local church affiliated with a hierarchical church organization." 443 U.S. 595, 597 (1979). And the Supreme Court noted that the "'neutral principles of law' approach" could be "consistent with . . . constitutional principles," so long as the "analysis entailed 'no inquiry into religious doctrine.'" *Id*. at 602-03 (quoting *Md. & Va. Eldership of Churches of God,* 396 U.S. at 368).

That's because neutral principles "relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges," and

"thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Id.* at 603. In other words, a court may choose this approach unless it "would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Id.* at 604 (citing *Serbian E. Orthodox*, 426 U.S. at 426 U.S. at 709, which makes no mention of neutral principles).

*Jones* points to two reasons a "neutral principles of law" approach cannot be applied here. First, this is not a property dispute between two factions of a church. To expand "neutral-principles" beyond the only context for which the Supreme Court has approved it risks allowing plaintiffs' lawyers to create a clever way to obliterate church autonomy entirely.

The impropriety of Plaintiffs' proposed extension of the neutral-principles approach is illustrated in later cases involving disputes between a church and its former minister. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012); *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020). These cases make no mention of the neutral-principles approach. And other courts have likewise resisted any expansion. *See Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986) (rejecting "neutral principles of law" exception to church autonomy doctrine as applied to state law tort claims, including defamation and intentional infliction of emotional distress, against a church in a challenge to a forced retirement); *Erdman v. Chapel Hill Presbyterian Church*, 286 P.3d 357, 368 (Wash.

2012) (en banc) (rejecting "neutral principles of law" exception to church autonomy in state tort claim related to ministerial employment). *See also* Carl H. Esbeck, *An Extended Essay on Church Autonomy*, 22 Federalist Soc'y Rev. 244, 258 (2021) ("It bears special caution that resorting to a rule of neutral principles has been permitted only where the disputing factions have abandoned any attempt to remain together as a unified religious entity, leaving for resolution only the issue of which faction is to be awarded ownership of the church property.").

Second, the neutral-principles approach cannot be applied here because it would require this Court to inquire into religious doctrine—the definition or practice of tithing. *See Jones*, 443 U.S. at 603. And since this would involve the Court in picking sides in a religious controversy, under *Jones* the Court "must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Id*. at 604 (citation omitted). So, if one accepts that resolution—that is, the Church's definition of tithing—fraud cannot be argued. *Accord Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 451 F. Supp. 3d 1227, 1238 (D. Utah 2020) (rejecting fraud claims because under the First Amendment "the court may not assess the veracity of the Church's religious beliefs"); *Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 551 F. Supp. 3d 1206, 1221-22 (D. Utah 2021) (observing that "the critical issue underpinning the church autonomy doctrine is whether the dispute is secular or religious," and so rejecting a common-law fraud claim because it "is based on ecclesiastical issues and implicates the Church's

13

fundamental religious beliefs"). *See also U.S. v. Ballard*, 322 U.S. 78, 85-88 (1944) (veracity of a religious belief may not be assessed by jury).

In short, the Church's church-autonomy defense to this suit cannot be defeated by resorting to the "neutral-principles" doctrine articulated in *Jones*.

## CONCLUSION

Allowing Plaintiffs' suit to proceed would plainly violate the First Amendment by injecting courts into a religious dispute over the meaning of religious doctrine and into matters of internal governance about how and when to spend religious donations to further a church's mission. It was to avoid such entanglement of church and state that the Establishment Clause was adopted. Nor can narrow fraud exceptions to the church autonomy doctrine or a "neutral principles" approach enable Plaintiffs to sidestep the Constitution.

Accordingly, the Court should dismiss Plaintiffs' claims with prejudice.

Dated: September 24, 2024

Respectfully submitted,

*/s/ Gene C. Schaerr*
Gene C. Schaerr
James C. Phillips
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, D.C. 20006
Telephone: (202) 787-1060
Facsimile: (202) 776-0136
gschaerr@schaerr-jaffe.com

*Counsel for Amici Curiae*

14

## APPENDIX

**The General Conference of Seventh-day Adventists** is the national administrative body for the Seventh-day Adventist Church, a Protestant Christian denomination with more than 22 million members.

**The National Association of Evangelicals** is largest network of evangelical churches, denominations, colleges, and independent ministries in United States— serving forty member denominations as well as numerous evangelical associations, missions, social-service charities, colleges, seminaries, and independent churches.

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the requirements of DUCivR 7-6 and 10-1 because this motion was prepared in 12-point Century Schoolbook, a proportionally spaced typeface, using Microsoft Word, and because this brief contains 3,521 words.

Dated: September 24, 2024

/s/ *Gene C. Schaerr*
Gene C. Schaerr

16